**Howard JAMISON, Administrator of the Estate of Jesse Click, Deceased,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, a Pennsylvania corporation.**

**Civ. A. No. 62–040.**

United States District Court
W. D. Pennsylvania.

March 24, 1966.

William McVay, Pittsburgh, Pa., for plaintiff.

Frederick Egler, Pittsburgh, Pa., for defendant.

ROSENBERG, District Judge.

The defendant, Westinghouse Electric Corporation, is here on its Motion for Judgment N.O.V. and seeks to set aside the two verdicts in favor of the plaintiff in the sum of $71,816.00 under the Pennsylvania Wrongful Death Statute, and $1,238.20 under the Pennsylvania Survival Action.

The deceased, Jesse, Click, met his death while employed as a painter by Eichleay Corporation, a sub-contractor of the defendant, on the premises owned by the United States of America and operated by the Atomic Energy Commission. The Atomic Energy Commission had entered into a contract with the defendant, Westinghouse Electric Corporation, for the performance of atomic energy work. The relationship of the parties had been set out in a contract between the Atomic Energy Commission and Westinghouse. The premises known as the Bettis Atomic Power Laboratory, as owned by the Government, had been turned over to Westinghouse in accordance with the terms of that contract. At the time of the deceased's death, a sub-contract had been entered into between Westinghouse and Eichleay for the performance of certain work by Eichleay.

The dispute presented to the jury which is now involved in the defendant's Motion For Judgment N.O.V. related to whether or not Westinghouse was a statutory employer within the meaning of the Pennsylvania Workmen's Compen-

sation Act of June 2, 1915, P.L. 736, Art. II, § 203, as amended 77 P.S. § 52.[1]

The deceased as the employee of Eichleay, while employed with others in the painting of the Bettis Laboratory ceiling, had done so from a vantage place of a scaffold. During the course of the painting one of the chokes (an iron cable) which lashed a part of the scaffold together broke and the scaffolding collapsed. The deceased was hurled to a sudden death. The claim of the plaintiff was based upon the negligence of the defendant Westinghouse. The defendant Westinghouse, in addition to denying negligence, also claimed the benefits of Eichleay's Workmen's Compensation insurance as it covered the deceased and other employees performing the work as painters at the time. The issues as they developed at the trial are well defined by counsel for the parties.

The present Motion for Judgment N.O.V. sets forth the following reasons:

"1. The Verdicts and judgments referring to Statutory employer regarding the regular part of Westinghouse's business were against the law; and

2. The verdicts and judgments are against the weight of the evidence and the law on the issue of statutory employer."

The motion as here presented is thus predicated on the words of § 203 of the Pennsylvania Workmen's Compensation Act—"for the performance upon such premises of a part of the employer's *regular business* entrusted to such employe or contractor." (Emphasis supplied)

The verdicts as rendered resulted in the second trial of this case. At the first trial the jury answered interrogatories in favor of the defendant. Upon motion by the plaintiff, I granted a new trial for the reason, not raised by counsel, that certain contracts were admitted into evidence contrary to a determination by our Court of Appeals in Howard Jamison, Adm. of the Estate of Albert Tucker, Deceased v. A. M. Byers Company, 330 F.2d 657, C.A. 3, 1963.

At the second trial of this case, the jury returned the verdicts as indicated, in addition to answers to interrogatories. Thereafter, I granted a motion for a new trial limited to damages on account of the paucity of the evidence not substantially supporting the jury's verdicts. The next trial proceedings came before Judge Miller of this Court. After the commencement of the third trial, the parties agreed to the amount of damages, without prejudice, but with the right of the defendant to proceed on the determination of the technical question as contained in the Motion For Judgment N.O.V. This was the same question which counsel for the defendant had urged be referred to the Court of Appeals prior to a determination on damages. I, however, required that all questions be first decided here so that the entire case could be presented thereafter in orderly fashion to the Court of Appeals.

██ The Motion For Judgment N.O.V. here hinges upon whether the defendant was or was not the statutory employer of the deceased, Jesse Click, as of the time of the accident with its resulting dire consequences. Ordinarily, the question of whether or not one is a statutory employer hinges upon the right of control. Girardi v. Lipsett, 275 F.2d 492, C.A. 3, 1960; Boettger v. Babcock & Wilcox Co., 242 F.2d 455, 458, C.A. 3, 1957; D'Alessandro et al., v. Barfield et al., 348 Pa. 328, 331–332, 35 A.2d 412, 1944; McDonald v. Levinson Steel Co., 302 Pa. 287, 294, 153 A. 424, 1931.

But the question of control by Westinghouse was not the significant question as it related to the contracts, and that ques-

---

1. "An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's *regular business* entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe." (Emphasis supplied)

tion was accordingly determined by me from the contents of the contracts without objection by counsel. The question raised was whether or not the deceased, while he met his death at the time of the accident, was engaged in employment as encompassed or incorporated in the terms of the contract between the Atomic Energy Commission and Westinghouse Electric Corporation, and later in the sub-contract with the deceased's employer, Eichleay Corporation.

The parties gravitated to this question and ultimately agreed upon its incorporation in Interrogatory No. 1 for the jury's determination. The record amply supports this. I shall refer to some of the excerpts to demonstrate this fact.

First of all, it is reflected in the arguments of counsel before the jury at Transcript page 324 by Mr. Egler:

"The issue is whether the painting of 'F' Building was a regular part of Westinghouse's business under the contract."

It was discussed by the plaintiff's counsel before the jury at Transcript pages 339 et seq. In substance he argued to the jury on what was the regular work of Westinghouse under this contract, and referred to what one of the witnesses said of painting as "housekeeping", and that this work had been going on prior to the contracts. He argued that this was "home making" work.

The defense counsel on the other hand argued the contrary to the jury at Transcript pages 320 et seq. that Westinghouse was commanded by its contract with the Government to take all reasonable measures to protect the property in accordance with sound industrial practice, to protect from loss or damage, and subject to the provisions of Section 5, to keep in good operating condition and repair all such government property. He also argued that this contract gave Westinghouse the right to retain necessary personnel, to do all things required for the efficient prosecution of the work in accordance with good industrial practice and for the major portion of research

development in engineering and design to enter into contracts for other services.

He argued at Transcript page 323:

"Now, what is Westinghouse doing at the time of the accident? At the time of the accident Westinghouse is renovating and painting, having Eichleay paint the ceiling on the "F" Building.

Now, what could be more in accordance with sound industrial practice? And in the attempt to protect government property, than the painting of the ceiling of a building?"

Further, at Transcript page 325 it was repeated in these words:

"Well, under the prime contract, Westinghouse agreed to take care of the government-owned facilities in accordance with sound industrial practice. It agreed to protect the government property.

I submit to you, that it was what we were doing when we were painting. We were renovating, protecting, taking care of the property so it would last."

In my presentation of the case to the jury, I discussed the portions of the contract relating to Interrogatory No. 1, prior to my presenting that interrogatory to it, and I said, at Transcript page 365:

"You are now being called upon in answering interrogatory number one, in effect, to make the determination of whether or not what Eichleay did under its subcontract in the erecting of the scaffolding within 'F' Building, at the Bettis project, and the processes of painting the ceiling there amounted to a part of the regular business of the defendant Westinghouse.

In other words, was Mr. Click in painting the ceiling engaged in the performance upon the premises of Westinghouse doing a part of Westinghouse's regular business as such work was entrusted to Mr. Click through his employer Eichleay?

The plaintiff says that the painting of the ceiling was not performance of a part of the regular business of Westinghouse; but the defendant says that

it was as is indicated in the Atomic Commission agreement, as excerpts therefrom prove and as such have been presented in evidence."

However, the instruction to the jury as a whole will show that it was made aware of the contractual significance as it may have related to the part which the deceased played or did not play in furthering the Atomic Energy purposes incorporated in those contracts.

The real question presented here by the defendant, then, is whether or not Interrogatory No. 1 and the instructions to the jury were understandably presented as it related to the contracts involving the defendant Westinghouse in the performance of the atomic energy work.

At Transcript pages 364–368 in this regard it was amply set forth in this part of the instructions:

"The first interrogatory is:

Question: Was a part of the regular business of the defendant, Westinghouse Electric Corporation, as a contractor under the Atomic Energy Commission contract, entrusted to Eichleay as the subcontracter, during which time the deceased met his death?

You had testimony here produced before you regarding excerpts from the contract between the defendant Westinghouse and Eichleay, and between the Atomic Energy Commission and the defendant Westinghouse. These excerpts were read into evidence, some by the plaintiff and some by the defendant. And, I believe, that copies of these will be furnished you.

These excerpts or, at least, in part, also will be considered later on as I discuss another instruction, but, for the present, you will consider the excerpts in the contract as read to you concerning the functions and the duties of Westinghouse and Eichleay.

The United States, acting through the Atomic Energy Commission, as an instrumentality of the government, entered into a contract with the defendant Westinghouse for the performance of certain functions and purposes with which the Atomic Energy Commission was concerned.

The contract between Westinghouse and its subcontractor, Eichleay, imposed certain duties and obligations upon Eichleay in Eichleay's performance of its subcontract with Westinghouse.

You are now being called upon in answering interrogatory number one, in effect, to make the determination of whether or not what Eichleay did under its subcontract in the erecting of the scaffolding within 'F' Building, at the Bettis project, and the processes of painting the ceiling there amounted to a part of the regular business of the defendant Westinghouse.

In other words, was Mr. Click in painting the ceiling, engaged in the performance upon the premises of Westinghouse, doing a part of Westinghouse's regular business as such work was entrusted to Mr. Click through his employer Eichleay?

The plaintiff says that the painting of the ceiling was not performance of a part of the regular business of Westinghouse, but the defendant says that it was as is indicated in the Atomic Commission agreement, as excerpts therefrom prove and as such have been presented in evidence.

In other words, the question before you will be: Was this painting of the ceiling a part of the function and duty of Westinghouse in the performance of its regular business of furthering the Atomic Energy purpose? Or was it incidental work of maintenance and not necessarily a part of Westinghouse's regular business.

You will not here be concerned with the accident itself, nor how it occurred, but simply with the question of whether the erection and maintaining of the scaffold for the purpose of the painting of the ceiling in 'F' Building, and the actual painting of the ceiling of 'F' Building amounted to a part of the regular business of the defendant Westinghouse under this contract.

I shall not re-read or discuss the excerpts that have been presented to you in evidence, but you will recall that, in part, there was a statement to the effect that the Bettis project, as a whole, was to be used for Atomic Energy purposes.

Whether that was said once or more, I do not recall, but this will be a matter for you.

Both the plaintiff and the defendant agree to this, but the plaintiff contends that the actual painting of the ceiling of 'F' Building, and the erection of equipment to place the painters thereon for the purpose of painting the ceiling was not a part of Atomic Energy work; that it was casual work as done by any other who may procure painters in homes or other businesses.

It will therefore be for you to determine whether or not the painting of the ceiling of 'F' Building by Mr. Click and other painters at any time, from March 13 to March 16th, 1961, in that building, was or was not performance by such men of a part of the employer's regular business.

Your answer to interrogatory number one will be either 'yes' or 'no'.

If you determine that the painting was incidental to the business of the Atomic Energy project or purpose, you will answer 'no' to interrogatory number one.

If you determine that it was a part of the Atomic Energy purpose and, therefore, a part of the regular business of Westinghouse, you will answer 'yes'."

The jury was made aware of any possible contractual tie-ins as they answered Interrogatory No. 1. The jury was amply instructed on the inter-relationship between the question and the excerpts of the contracts introduced into evidence by the parties.

The defendant's argument is to certain words as used by me as the word "incidental" was used on Transcript page 366 in the following:

"Was the painting of the ceiling a part of the function and duty of Westinghouse in the performance of its regular business of furthering the Atomic Energy purpose? Or was it incidental work of maintenance, and not necessarily a part of Westinghouse's regular business."

Again at Transcript page 367:

"I shall not re-read or discuss the excerpts [that] have been presented to you in evidence, but you will recall that, in part, there was a statement to the effect that the Bettis project, as a whole, was to be used for Atomic Energy purposes.

\* \* \* \* \* \*

It will, therefore, be for you to determine whether or not the painting of the ceiling of 'F' Building by Mr. Click and other painters at any time, from March 13 to March 16th, 1961, in that building, was or was not performance by such men of a part of the employer's regular business."

And, at Transcript page 368:

"Your answer to interrogatory number one will be either 'yes' or 'no'.

If you determine that the painting was incidental to the business of the Atomic Energy project or purpose, you will answer 'no' to interrogatory number one.

If you determine that it was a part of the Atomic Energy purpose, and therefore, a part of the regular business of Westinghouse, you will answer 'yes'."

The second word to which the defendant objects is "casual" (Tr. pg. 406 et seq.) or maintenance work not within the scope of the contract as against whether it was work directed by the contract.

Counsel were invited to formulate the interrogatories to be presented to the jury (Tr. pg. 188), and it was so done as further indicated by the record (Tr. pgs. 294 through 300).

As for Interrogatory No. 1, the record plainly indicates that this was submitted by Counsel as being more apt to the cir-

cumstances of this case than a question on the right of control as that question would ordinarily have been required to be determined. Girardi v. Lipsett, supra; Boettger v. Babcock & Wilcox Co., supra; D'Alessandro et al. v. Barfield et al., supra; McDonald v. Levinson Steel Co., supra.

The discussion relating to whether or not the words "Atomic Energy Commission" was contained in the interrogatory is reflected and phrased (Tr. pgs. 297–299) to accommodate counsel in these words:

"Mr. Egler: * * * I would like it to say, 'was a part of the regular business of defendant Westinghouse Electric Corporation under the contract with the Atomic Energy Commission entrusted to Eichleay' * * and so on and so forth. So that it is clearly brought to the jury, the fact that we are relating the problem to the contract between Westinghouse and the Atomic Energy Commission.

The Court: Well, would you like it this way? Would either one of you object to this? Was a part of the regular business of the defendant Westinghouse Electric Corporation, as the contractor under the Atomic Energy Commission contract—

Mr. McVay: That is all right.

Mr. Egler: That is all right.

Mr. McVay: Under the Atomic Energy Commission contract.

The Court: You have contractor. Under the Atomic Energy Commission contract entrusted to Eichleay as the subcontractor, during which time the deceased met his death?

Now, that reads as interrogatory number one.

Was a part of the regular business of the defendant Westinghouse Electric Corporation, of the defendant Westinghouse Electric Corporation, as a contractor under the Atomic Energy Commission contract, entrusted to Eichleay, as the subcontractor, during which time the deceased met his death?

Now is that satisfactory?

Mr. Egler: Yes, your Honor.

The Court: Mr. McVay?

Mr. McVay: Yes, your Honor."

So, it will be seen that the interrogatories were as Counsel desired them to be presented and the instructions set out the contentions and the arguments of counsel to the jury instructing the jury as to how or what its determination was to be.

Counsel, at the second trial, agreed to submit to the jury such excerpts as each desired. This was done without objection. It is shown on the record (Tr. pg. 165 et seq.). The matter of agreement and disagreement were pretty well defined by counsel for the defendant starting with Transcript page 169:

"Mr. Egler: It is agreed that the Atomic Energy owned the premises. It is agreed that the plaintiff was an employee of a subcontractor.

It is agreed that Westinghouse was in control of the premises. The question—I am referring to the approach of the Court on this thing. The problem that we disagree, that he and I disagree on is the fifth provision, whether or not part of the employer's regular business was entrusted to such subcontractor or whether or not parts of Westinghouse's regular business under its contract with the Atomic Energy Commission was entrusted to Eichleay.

Now, if under Judge Kalodner, if the construction of the contract is for the Court, then the construction of the two contracts is likewise for the Court."

The granting of a new trial was on the authority of Judge Kalodner in the case of Howard Jamison, Adm. of the Estate of Albert Tucker, deceased v. A. M. Byers Company, supra, on the theory that I had erroneously permitted the entire contracts to be presented to the jury.

The defendant objected to these instructions, as he put it, (Tr. pg. 413), "* * * I would like the Court to charge the jury that in deciding what is

the regular business of Westinghouse in regards to this painting, they decide whether or not the painting is authorized under the Atomic Energy contract." The aim of defendant was to have me make a determination as a matter of law that the painting was authorized by the contract, and that, therefore, the deceased was to be classified as a statutory employee in the performance of the Atomic Energy work. This is in essence what the defendant presently desires by its Motion For Judgment N.O.V.

During the course of the trial, the position of counsel for the defendant was sought on whether or not this question was to be submitted as one of law or of fact, but he refused to commit himself when he said (Tr. pg. 186), " * * * I cannot estop myself in such a manner."

It may be that the painting of the ceiling of "F" building, as it was done by Eichleay at the instance of Westinghouse, was as counsel for the defendant argued, a prosecution of the contract for the preservation of property in accordance with good industrial practice, rather than necessary house-keeping as argued by counsel for the plaintifff.

If the subcontract between Westinghouse and Eichleay had been specific in indicating or including painting of the ceiling of the building, it would appear to be a simple question of law, and I would have so interpreted it. But the phraseology of the agreement as read into evidence as it defined the contract's purpose was as follows: (Defendant's Exhibit A and Tr. pg. 193)

"WHEREAS, Westinghouse has contracted with the United States of America (hereinafter called the 'Government'), through the Atomic Energy Commission (hereinafter called the 'Commission'), under Principal Contract Number AT–11–1–GEN–14, effective as of December 10, 1948, and supplements thereto to engage in research and development in matters pertaining to atomic energy at the Bettis Atomic Power Laboratory, and

WHEREAS, Westinghouse desires certain work and services incident to the renovation, relocation, and installation of machinery and services to provide for consolidation of the Bettis and Clairton Sites of the Bettis Atomic Power Laboratory."

The contract does not give details of all its included work. The purpose of the contract is not necessarily ambiguous, but neither is it revealing in the sense concerning which counsel dispute its significance. There was no evidence that painting was required or that a special kind of paint might have been required in atomic energy research functioning. There is no evidence regarding its aesthetic or utility values.

Does the clause "renovation, relocation, and installation of machinery and services to provide for consolidation of the Bettis and Clairton Sites of the Bettis Atomic Power Laboratory" include the painting of the ceiling of "F" building? Unquestionably the regular business of Westinghouse under its contract was "to engage in research and development in matters pertaining to atomic energy at the Bettis Atomic Power Laboratory." We assume that painting is a matter of good husbandry in all phases of life. Perhaps it did contribute to the well-being of employees to have a well painted ceiling over their heads as they were engaged in the Atomic Energy research and development. Was this work a part of the regular business of Westinghouse in the Atomic Energy project, as this part was entrusted to the deceased and his co-workers?

So far as the phraseology of the contract was concerned, during the trial of this case, I could not determine the painting of the "F" building ceiling to be a matter of law; one within the regular business of Westinghouse at the Bettis Atomic Energy plant.

I was of the opinion that substantial issues of fact existed which should have been presented for the jury's determination. I now hold that the interrogatories as approved by counsel, which the jury decided, were factual questions. Boettger v. Babcock & Wilcox Co.,

supra; McDonald v. Levinson Steel Company, supra.

In Boettger v. Babcock & Wilcox Co., supra, 242 F.2d at page 458, a case similar to ours, Judge Hastie reminded that "The courts of Pennsylvania have construed this section strictly." Furthermore, he demonstrated that circumstances of occupancy or control by a statutory employer and his permission of the workman "to enter the premises in furtherance of his regular business" may involve factual questions which preclude granting of summary judgment as a matter of law.

For all of these reasons, the present motion of the defendant for Judgment N.O.V. will be denied.